ORIGINAL

FILED
SEP 4 2008
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BALDWIN TECHNOLOGIES, INC. | ) | |
| Plaintiff | ) | |
| v. | ) | No. 08-623 C |
| THE UNITED STATES OF AMERICA | ) | |
| Defendant | ) | |

## COMPLAINT

Baldwin Technologies, Inc., by counsel for its Complaint against the United States of America alleges as follows:

## PARTIES

1. Plaintiff Baldwin Technologies, Inc., ("BTI") is a Maryland corporation with its principal place of business at 4907 Niagara Road, College Park, MD 20740.
2. Defendant is the United States of America (the "Government") acting by and through the United States Department of Commerce, the National Oceanic and Atmospheric Administration, and the National Institute of Standards and Technology (collectively "NIST").

## JURISDICTION

3. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. 1491 and the Contract Disputes Act, 41 U.S.C. 601-613.

## BACKGROUND

4. The action arises from NIST's improper and unlawful termination for cause of Purchase Order RA1341-06-NC and Purchase Order RA1341-04-4B-0678 (the "Orders") (Exhibit A).

5. The Orders were awarded by NIST to BTI's under its General Services Administration contract number GS-07F-0718N ("GSA Group 61 Schedule") (Exhibit B) which had been awarded to BTI in August 2003.

6. The Orders were awarded respectively on September 17, 2004 and March 15, 2006. BTI was to supply two Rotary Uninterruptable Power Sources ("RUPS") units and ancillary services to NIST's Boulder, Colorado facility. The Orders acknowledged BTI's GSA Group 61 Schedule and BTI's proposals/quotes.

7. Because the installation and processing of a RUPS unit is a complex process, NIST's responsiveness and cooperation were essential to successful performance. However, NIST consistently failed to make timely decisions, added work to the requirements, failed to tender payment to BTI for its subcontractors, failed to provide information and resources, and failed to respond to inquiries from BTI. NIST's conduct delayed the work under the Orders.

8. Notwithstanding NIST's clear responsibility for BTI's inability to render timely performance, BTI's repeated assertions that the resulting performance delays were excusable, and the clear regulatory and contractual guidance to refer the assertion of an excusable delay to BTI's GSA Schedule Contracting Officer, the NIST Contracting Officer took it upon herself to unlawfully terminate the Orders.

9. NIST's termination of the Orders for cause was improper and exceeded the scope of the NIST Contracting Officer's authority.

10. In this action, BTI seeks relief from the improper termination of the Orders for cause. Specifically, BTI seeks conversion of the termination for cause to a termination for the convenience of the Government.

**BTI'S GSA SCHEDULE CONTRACT AND NIST'S INITIAL RUPS ORDER**

11. On or about August 1, 2003, BTI was awarded its GSA Group 61 Schedule to supply building materials and industrial services. Therein, BTI offered various electric generators, RUPS, power distribution units, and related services.

12. BTI's GSA Group 61 Schedule also contained a mandatory provision requiring that if an agency ordering officer wished to terminate an order issued to a contractor under that contract and the contractor alleged that the failure to perform/deliver was "excusable" then the matter must be referred to Contracting Officer of the GSA. (Default, I-FSS-249-B)(May 2000). This provision remained in BTI's GSA Group 61 Schedule contract during the time both Orders were issued by NIST and as of the date of this action. BTI has not signed a contract modification permitting the removal of said provision. BTI's GSA Group 61 Schedule contract also contained a mandatory provision stating that changes to the contract could only be made via a written agreement of the parties as opposed to a unilateral pronouncement of the government.

13. On or about July 2004, BTI commenced the preparation of a proposal for NIST's Boulder, Colorado location (Exhibit I). Therein BTI proposed supplying a single RUPS unit, a power house facility in which up to four RUPS units could reside, and ancillary services.

14. After negotiating the terms and conditions of the contract/order, BTI and NIST executed Order RA1341-04-4B-0678 ("Initial Order") on September 17, 2004 at a price of $3,246,165. The Initial Order referenced BTI GSC Group 61 Schedule and BTI's quote.

15. From September 17, 2004 to on or about March 14, 2005, BTI proceeded according to schedule to design the RUPS unit and its facility at NIST's Boulder, Colorado location. BTI received comments and direction from NIST regarding the design of the RUPS unit and facility. The parties communicated in weekly status meetings held between BTI and NIST.

16. On or about March 21, 2005, NIST directed BTI to change the site location of the RUPS power house facility. This process delayed BTI's operations. BTI changed the location in the design documents and advised its suppliers and subcontractors of the change. The suppliers and subcontractors continued to ship the required hardware throughout the Spring of 2005.

17. On June 6, 2005, NIST officials, Jim Burleson and Jim McConnell witnessed the successful factory test of the RUPS unit at SatCon's facility in Worchester, MA.

18. On June 14, 2005, the RUPS unit was shipped to NIST.

19. On or about June 2005, BTI's subcontractor in charge of construction of the facility, Riviera Electric, Inc., ("Riviera") provided a construction schedule and advised BTI that the RUPS units and power house facility would be ready for commissioning (i.e., formal testing based on opportunity specific test plan) on November 1, 2005.

20. On or about July 29, 2005 the construction of the RUPS site at Boulder, Colorado commenced.

21. On or about October 7, 2005, BTI's subcontractor Riviera, advised BTI that they were having difficulties obtaining concrete as the destruction caused by Hurricane Katrina had

severely impacted their efforts to obtain the necessary materials such as concrete. BTI ascertained that all like contractors were facing the same delays due to the hurricane rebuilding efforts. This delay was beyond BTI's control and unforeseeable.

22. On or about October 17, 2005, Riviera advised BTI that the commissioning would commence in early January 2006. The commissioning projection was later revised by Riviera to late January 2006 and finally to late March 2006. These delays, caused by the aftermath of Hurricane Katrina and the shortage of concrete, were relayed to NIST and beyond BTI's control and unforeseeable.

23. The RUPS unit was set in place on or about February 10, 2006.

24. The Order for the Initial RUPS Unit contained a provision for a site test. BTI agreed to delay the site test and combine it with the Second RUPS Unit to save NIST money. However, the delay allowed NIST to retain the final 10% due to BTI under the Initial Order.

25. Payment for the RUPS unit and related services was accomplished via an agreed upon payment schedule whereupon BTI received 90% of all invoiced amounts. This agreement was made by an authorized NIST representative and placed in writing. BTI relied upon this payment schedule and provided payment to its suppliers and subcontractors consistent with said schedule.

**NIST SECOND RUPS UNIT ORDER**

26. In November 2005, NIST requested that BTI provide a pricing proposal for a second RUPS unit at the Boulder, Colorado facility ("Second RUPS Unit"). In response to said request, BTI requested that its principal suppliers and subcontractors, including Riviera,

SatCon Technology Corporation ("SatCon"), and Niagara Transformer Corporation ("Niagara") provide quotes that included pricing and a time schedule for completion of the project.

27. BTI relied on the fact that NIST's progress payment schedule employed under the Initial RUPS Order would continue. BTI relied on the progress payment process in negotiating with its subcontractors for the Second RUPS unit. The 90% payment schedule was identified in BTI's quote to NIST.

28. In January 2006, BTI obtained quotes and timetables from its principal subcontractors, including Niagara who advised BTI that the transformer and reactor part of the Second RUPS Unit would be delivered to Boulder, Colorado within 16 to 20 weeks after award. Due to delays beyond BTI's control (i.e., weather conditions) the transformer and reactor were subsequently delivered 46 weeks after award. Due to the specialized nature of the equipment and the need for it to be an integrated part of the prior RUPS unit, there were no secondary markets or alternate sources of supply. NIST was advised of these delays and the delays beyond BTI's control and unforeseeable.

29. In February 2006, BTI submitted a detailed proposal/quote to NIST to supply the Second RUPS unit for a price of $2,439,838.00 and required that the same progress payment schedule be honored (Exhibit J). Consistent with said proposal, on March 15, 2006 NIST issued a Purchase Order to BTI for the Second RUPS Unit. The supplies and services were to be paid for in accordance with the BTI quote with no exceptions noted.

30. In addition to the weekly status calls, NIST and BTI engaged in two conference calls, respectively on or about February 27, 2006 and March 2, 2006, during which time numerous outstanding issues related to the Orders were discussed. NIST issued a letter on April 2, 2006 in which NIST allegedly attempted to, "confirm all agreements that

were made in the conference calls." BTI objected to the conclusions set forth in the letter, such as the unilateral pronouncement that, "It was agreed that the Government has not delayed contract performance."

31. NIST initially honored the 90% progress payment agreement for Second RUPS Unit.

32. On April 6, 2006 NIST issued a contract modification regarding the progress payments. BTI and NIST previously agreed upon a progress payment process whereby NIST would withhold 10% of all BTI invoices. BTI executed the April 6 modification knowing that the parties had an agreement whereby 90% of BTI's invoices and cost would be paid.

33. On April 6, 2006, BTI provided NIST with a schedule for completing the Second RUPS Unit installation. Based on the information BTI had received from its subcontractors and the assumption that NIST would maintain a steady environment and provide necessary cooperation and responsiveness, BTI projected a completion date on or about November 2006. However, NIST failed to provide a steady environment, cooperation, and responsiveness.

34. SatCon advised BTI in July 2006 that the factory test for the Second RUPS Unit would be complete by the end of August 2006 allowing for shipment of the unit soon thereafter. SatCon later revised this projection and the factory test took place on or about October 25, 2006. Due to SatCon's role in the Initial RUPS Unit project to which the Second RUPS Unit would be integrated, there was no alternate source for SatCon's supplies/services.

35. On or about June 2006, NIST dishonored the progress payment plan agreed to by the parties and unilaterally commenced a 20% hold-back of BTI's invoices and costs incurred. To no avail, BTI shared its objection to NIST.

36. The Second RUPS Unit was shipped by SatCon to NIST on or about November 6, 2006. On the same date, BTI received notice from Niagara that the transformer and reactor which were to be coupled with the SatCon Second RUPS Unit would be further delayed due to a severe ice/snow storm which shut down Niagara's Buffalo, New York facility. The equipment was eventually shipped to NIST on or about December 18, 2006, nearly thirty (30) weeks later than promised in Niagara's original projections provided to BTI in January 2006. BTI had no control over Niagara's schedule and an alternate vendor was not available.

37. In January 2007, NIST sent BTI two separate performance demands which exceeded the original scope of work in the Orders. NIST demanded that BTI remedy a Boulder, Colorado campus wide power coordination issue and also determine whether the RUPS power house facility was a shelter or a building so that modifications to the structure could be accomplished. These demands were outside the scope of the Orders. While contending that the demands were outside the scope of the Orders and would delay project completion, BTI diverted resources in an attempt to address NIST's demands.

38. For nearly three months, BTI examined the building/shelter issue presented by NIST and communicated with NIST regarding this matter. Subsequently, NIST agreed with BTI's original contention that the power house facility was a shelter. BTI was then able to rededicate the diverted resources back to the RUPS project.

39. On or about April 2, 2007, after numerous communications, NIST committed to issuing a new specification to remedy the power coordination issue as opposed to including it as an in-scope modification to the Orders. NIST chose to contract this effort directly to Riviera and not to modify the Orders. NIST formally advised BTI of this development in an April 2, 2007 letter which also advised BTI that NIST had developed a plan to reconfigure the

Initial RUPS Unit at no additional cost to the Government. BTI was then able to rededicate the diverted resources to the RUPS project. Notwithstanding the above, NIST also continued to opine that it had not delayed the project. BTI took exception to this contention as the January 2007 performance demands were outside the scope of the contract and forced BTI to divert resources to finding a solution to the government problems/demands.

40. From on or about January 30, 2007 through May 31, 2007, NIST rejected without explanation BTI invoices in the aggregate amount of $274,347.96. As a result of NIST's failure to honor invoices for work performed and costs incurred, BTI's ability to fully pay its subcontractors was severely impacted.

41. In its April 2, 2007 letter, NIST also asked BTI to provide an "updated schedule" for the completion of the Second RUPS Unit project. BTI supplied said schedule on April 30, 2007 which was amended on May 14, 2007 consistent with the understanding developed at the parties' weekly progress/status meeting. BTI projected a completion date of August 2007. NIST stated no objections to BTI.

42. On or about 2007, NIST demanded that additional changes to the RUPS facility be made by BTI. These included moving of the doors and placement of the large battery cells.

43. On or about 2007, SatCon commenced a change in the bearing upon which the RUPS would rest. These bearing were of a superior quality and the change was made at no cost to NIST. However, this alteration caused a delay in the schedule.

44. NIST's revised practice of withholding 20% of incurred costs and invoice amounts from BTI eroded BTI's ability to fully pay all of its subcontractors. BTI attempted to fully pay those subcontractors who had completed their efforts in a timely manner while reserving a level of payments from those subcontractors who had contributed to the project delay

and/or had work to complete. Nevertheless, all of BTI's subcontractors remained committed to the project realizing that they had either contributed to the delayed completion or understood that NIST had contributed to the delay due to altered requirements, a revised payment schedule, and a waiver of the original completion schedule.

45. On or about June 1, 2007, NIST issued modification number 5 to the order for the Second RUPS Unit setting August 17, 2007 as the revised completion date. Concurrent with the issuance of modification number 5, SatCon proposed adding extra steel reinforcement for the RUPS units at no cost to NIST. NIST welcomed this advancement notwithstanding the fact that delivery and installation of the added steel reinforcement would add time to the project completion date. On June 18, 2007 during the weekly status meeting, BTI supplied a revised completion date of August 20, 2007.

46. Consistent with its proposal, BTI provided NIST with an acceptance test plan for the RUPS units to ensure that the project completion would be measured against an objective and agreed upon plan. NIST refused to acknowledge or execute the test plan leaving BTI and its subcontractors at a pause. BTI was required to test the equipment and provide the results to NIST but a test plan was required to ensure all parties had a common understanding of the requirements and parameters of the test.

47. On June 22, 2007, NIST issued a cure notice letter to BTI (Exhibit C). Therein, NIST alleged that BTI had failed to "coordinate and manage the NIST RUPS requirement to perform the performance schedule." NIST also alleged that BTI had failed to identify a date certain for the RUPS to be "power up."

48. On June 29, 2007, BTI responded to NIST's cure notice summarizing the agreement the parties had reached at a meeting in Boulder (Exhibit D). The response also established a schedule of milestones based on identified contingencies.

49. BTI's subcontractors remained on site as needed in June, July, and August of 2007 and met with NIST officials at the RUPS site on August 9, 2007.

50. On August 16, 2007, BTI forwarded a detailed Progress Schedule to NIST which outlined steps to bring the project to completion and to provide full payment to BTI's subcontractors notwithstanding the fact that NIST had continued to holdback substantial sums of money from BTI (Exhibit E) and rejected proper invoices. NIST responded on August 19, 2007, asking that the information not be provided via emails and that BTI needed to address a payment plan for BTI's subcontractors.

51. On August 22, 2007, NIST issued BTI a show cause notice (Exhibit F). In addition to re-stating the concerns shared in the June 22, 2007, cure notice, NIST advised BTI that they were concerned over BTI's ability to keep its subcontractors on-site, to keep to a defined schedule and perform the work. NIST advised BTI, in part, that SatCon had informed NIST that SatCon would "perform no further work." However, the letter also states that "SatCon does have employees on the jobsite" and is "progressing with correcting design flaws." The project was over 90% complete and NIST advised BTI that the "Government is moving forward".

52. On August 30, 2007, SatCon copied the NIST Contracting Officer on a letter sent to BTI which commenced with the narrative, "Please use this letter as confirmation that SatCon will continue to support the NIST Rotary UPS Project". The overwhelming majority of the outstanding work to be completed was SatCon's responsibility. The project was over 90% complete. The letter also detailed the payment conditions and a date certain for

completion of the project. SatCon had been performing on site preparing for the upgrade steel additions.

53. On or about September 1, 2007, BTI generated and sent a detailed response to NIST's show cause notice (Exhibit G). Therein, BTI addressed NIST's concerns in a reasonable and equitable manner stating; 1) BTI had provided a June 29, 2007 letter with attachments responding to NIST's cure notice, 2) BTI had reached an accord with SatCon regarding performance and payment which would require NIST to honor the rejected invoices and re-establish the agreed upon progress payments in full, 3) BTI's subcontractors were reluctant to work without an test acceptance plan, 4) the process required for BTI to draw funds against its line of credit would require an action by NIST, 5) BTI had obtained confirmation of safe and clean site conditions from the subcontractor assigned to that role, 6) many of the project delays were beyond BTI's control and therefore excusable, and 7) the work was substantially complete while inviting a continued dialogue.

54. On September 7, 2007, BTI received via facsimile from the NIST Contracting Officer a notice of termination for cause (Exhibit H). NIST cited without detail that BTI was unable to provide "adequate reasons to justify performance delays." NIST stated its reasons while providing no evidence that it truly considered BTI's June 29, 2007, or September 1, 2007, letters or other factors required by regulation.

55. Subsequent to the termination, knowing that maintenance and care would be necessary for the units, SatCon attempted to ascertain NIST's future plans for the RUPS units. SatCon's attempts were rebuffed and both BTI and its subcontractors were unable to secure the RUPS units and facility.

56. As of the date of this Complaint, NIST has yet to procure/complete the final steps of the RUPS project. As of the date of this Complaint, NIST has not attempted to obtain information on the care and maintenance of the RUPS units and had not requested said information through BTI or its subcontractors. BTI has made numerous overtures to complete the project and to provide counsel regarding the protection and maintenance of the RUPS units.

57. As a result of the termination for cause, BTI has lost contract awards and opportunities to obtain additional work with the United States and has had to dedicate substantial resources to remedy NIST's improper termination.

**COUNT I**

**Breach of Contract**

58. BTI repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

59. Upon execution, both Orders were binding contracts between BTI and NIST.

60. Pursuant to the termination clause of BTI's GSA Schedule Contract, incorporated by reference into both Orders at the time of execution, NIST agreed to refrain from making any determination regarding a performance delay under an order if the contractor claimed the delay was excusable and instead agreed to refer any assertion of excusable delay to BTI's GSA Schedule Contracting Officer for a final determination.

61. The requirement to refer any assertion of excusable delay to BTI's GSA Schedule Contracting Officer was a material contract requirement which may only be changed, amended, or revised with the written consent of BTI and the Government. Said consent was never provided.

62. Prior to receiving the September 7, 2007 notice of termination for cause, BTI asserted that its inability to meet certain schedule deadlines resulted from excusable delays.

63. On information and belief, the NIST Contracting Officer did not refer the assertion of excusable delay to BTI's GSA Schedule Contracting Officer, but instead based on her own accord, determined that the delays claimed by BTI were not excusable.

64. NIST's failure to refer the assertion of excusable delays to BTI's GSA Schedule Contracting Officer constituted a material breach of the Orders.

65. Pursuant to the termination for cause clause of BTI's GSA Schedule Contract and Orders, NIST's improper termination of the Orders for cause must be converted to a termination for the convenience of the Government.

## COUNT II

### Declaratory Judgment

66. BTI repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

67. As of the date of the award of BTI's GSA Group 61 Schedule Contract, FAR 8.405-5 provided as follows: "Should the contractor claim that the failure was excusable, the ordering officer shall promptly refer the matter of excusable delay to the schedule contracting officer."

68. The NIST Contracting Officer's purported termination of the Orders without referring the assertion of the excusable delay to BTI's GSA Schedule Contracting Officer exceeded the scope of the NIST Contracting Officer's authority and thus lacked any effect on the parties' rights and obligations under the Order.

69. BTI is entitled to a declaration that the termination notice exceeded the NIST Contracting Officer's authority and thus was without legal effect.

**COUNT III**

**Breach of Contract - Lockout**

70. BTI repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

71. Under the Orders, NIST had an implied duty to cooperate with BTI and to refrain from taking any action that would delay, hinder, or otherwise interfere with BTI's performance.

72. Following the issuance of the termination notice, NIST ordered BTI and its subcontractors to cease all work and refrain from the facility.

73. NIST's directions to stop work and exit the facility unreasonably interfered with BTI's performance by rendering it impossible for BTI to continue performance or to safeguard and secure the facility and RUPS units.

74. NIST's conduct materially breached its duty to cooperate and not hinder BTI's performance of the Orders.

75. BTI is entitled to a declaration that NIST's direction to stop work and refrain from the facility relieved BTI of any further obligations under the Orders.

## COUNT IV

## Excusable Delay

76. BTI repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

77. NIST significantly delayed the overall completion of the Orders by, among other things:

a. Failing to approve an acceptance plan;

b. Adding additional requirements to the Orders without additional time or funds;

c. Failing to honor the payment process agreed to by NIST officials;

d. Failing to cooperate with BTI and its subcontractors.

78. BTI's subcontractors delayed the overall completion of the Orders by, among other things:

a. Failing to furnish equipment to the Boulder, Colorado site in a timely manner;

b. Failing to conduct testing in a timely manner.

c. Altering equipment (i.e., bearings and additional steel)

79. The foregoing causes of delay were beyond BTI's control, occurred without BTI's fault or negligence, and were unforeseeable at the time the parties entered into the Orders.

80. Pursuant to the termination for cause provisions of BTI's GSA Schedule Contract, incorporated by reference into the Orders, BTI's failure to make progress under the Orders was excusable.

81. BTI's indication that it would be unable to meet the original completion date for the Orders did not manifest an unequivocal intention on the part of BTI that it would not render performance by the date because the schedule was required to be adjusted as the result of excusable delays.

82. NIST's termination of the Orders on the grounds of failure to make progress was improper because any delay encountered was the direct result of an excusable delay.

83. Pursuant to the termination for cause provision in BTI's GSA Group 61 Schedule Contract incorporated by reference into the Orders, NIST's improper termination for cause must be converted into a termination for the convenience of the Government and all sums due to BTI should be paid immediately.

## COUNT V

## Waiver of Completion Schedule

84. BTI repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

85. NIST knew or should have known that BTI would be unable to make the completion date for the Orders as early as February 2006.

86. Despite its knowledge that the completion date would be delayed, NIST engaged in affirmative acts and conduct inconsistent with an intent to terminate the Orders by, among other things:

    a. Holding meetings with BTI to establish a new schedule;
    b. Supporting BTI's Order activities;
    c. Encouraging BTI to continue performance;
    d. Meeting with BTI's subcontractors;
    e. Accepting upgrades which delayed completion.

87. NIST failed to terminate the Orders within a reasonable time of its knowledge that the completion date would be delayed.

88. BTI relied on NIST's failure to timely terminate the Orders to BTI's detriment by continuing to perform and incur significant costs under the Orders.

89. NIST's termination of the Orders on the grounds of failure to make progress was improper and therefore must be converted to a termination for the convenience of the Government.

**COUNT VI**

**Breach of Duty to Exercise Sound Discretion**

90. BTI repeats and incorporates by reference each and every paragraph above as if fully set forth herein.

91. An Order may only be terminated for cause after the Contracting Officer considers delineated factors, including, but not limited to:

    a. Then terms of the Contract and applicable laws and regulations;
    b. The specific reasons of the contractor for delay and/or failure;
    c. The urgency of the need for the supplies and/or service and the period of time to obtain them from an alternate source;
    d. The effect of the termination for cause upon the contractor's ability to fulfill other contracts; and
    e. The availability to obtain the supplies/services from alternate vendors.

92. Upon information and belief, the NIST Contracting Officer failed to exercise sound discretion by failing to consider the aforementioned factors when deciding to terminate the Orders.

93. NIST's termination of the Order was improper as the Contracting Officer failed to consider the mandatory factors stated above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, BTI, respectfully request this Court:

a. Declare and adjudge that NIST's termination for cause of the Orders was improper and therefore must be converted to a termination for convenience; and

b. Direct NIST to pay all outstanding invoices of BTI with required interest;

c. Award such other relief as the Court deems just and proper.

Respectfully Submitted,

Thomas K. David, Esq.
Attorneys for Baldwin Technologies, Inc

David, Brody & Dondershine, LLP
12355 Sunrise Valley Drive
Suite 650
Reston, VA 20191
Te: (703) 264-2220
Fx: (703) 264-2226

Date: September 4, 2008